**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JAMES L. WHATLEY,**

      **Petitioner,**

      **v.**

**WARDEN, ROSS
CORRECTIONAL INSTITUTION,**

      **Respondent.**

**CASE NO. 2:16-CV-676
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura**

## REPORT AND RECOMMENDATION

On June 2, 2017, the Court issued an *Opinion and Order* dismissing habeas corpus claims

four through nine, and directing the Respondent to file a *Return of Writ* addressing the remaining

habeas corpus claims, one through three. (ECF No. 19.) On June 23, 2017, Respondent filed the

*Return of Writ.* (ECF No. 20.) On August 14, 2017, Petitioner filed a *Traverse.* (ECF No. 23.)

The case is now ripe for review. For the reasons that follow, the Magistrate Judge

**RECOMMENDS** that this action be **DISMISSED**.

### Facts and Procedural History

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of

the case as follows:

> Maigen Blanchard Reaches Out to Tyler Burrell and Tells Him She
> Knows Where to Find Cash and Drugs
>
> Maigen Blanchard lived in Cambridge, Ohio with her stepmom,
> Pam Pifer. Brock Dilley, Blanchard's boyfriend and the father of
> her children, was incarcerated. Blanchard decided to reach out to
> her former boyfriend, Tyler Burrell, through Facebook, and sent
> Burrell a message on June 20, 2012, asking him to come visit her
> in Cambridge. Burrell responded on Thursday, June 21, 2012, and
> came to Cambridge from Zanesville with his friend Anjomo
> "Boomer" Churchill. Churchill drove the pair to Cambridge in a

light gold 2011 Chevy Cruze. Churchill was known to serve as Burrell's driver because Burrell did not have a valid license.

Burrell and Churchill spent several hours in Cambridge that Thursday. They drove around with Blanchard and Pifer, "looking at houses." Burrell asked Blanchard, "Who is the white boy who drives an Avalanche with 30–day tags who's always over in Zanesville?" Blanchard told him it was Christopher Morrison, a friend of Brock Dilley's. She offered to point out where Morrison lived. She also told Burrell "she heard" Morrison had lots of money and was known to keep cash in his sock drawer and drugs in cereal boxes.

On that first visit to Cambridge, Blanchard showed Burrell and Churchill the location of Morrison's apartment complex, Coventry Estates, located on U.S. Route 22, east of State Route 77, in Guernsey County. Burrell and Churchill dropped Blanchard off and didn't return that day. She thought they were going to go to a party together on Friday, but Burrell didn't return calls and didn't pick her up as they had planned. Burrell told her he'd come over on Saturday, June 23.

In the meantime, Burrell started gathering accomplices, telling them he knew of a "lick" (robbery) in Cambridge and asking if they wanted to be involved. Elgin Mitchell and Deondre Crosby signed on and started planning. Patience Sharrer drove Mitchell and Crosby to meet up with Burrell, who told Mitchell he needed to pick up "his dude," whom Mitchell understood to be an unnamed accomplice from Columbus.

Blanchard and Burrell Direct the Group to "Hit a Lick "

Saturday night, June 23, 2012, Blanchard was hanging out in Cambridge with Pifer and her friend Whitney Ford. She received multiple calls from Burrell on the landline phone, which Pifer could overhear, including discussion about robbing someone. Ford also heard discussion that people were "on their way," and Blanchard said she could show them where Morrison lived.

Around 2:00 a.m., the same light-colored Chevy Cruze pulled up and parked in front of the house, again driven by Churchill, with Burrell in the front passenger seat [the "Burrell car"]. Pifer and Ford noticed a second, darker car following the Burrell car, which pulled past the house and parked down the street. Alarmed, Pifer told Blanchard that if she got in the car, not to bother coming back. Heedless, Blanchard approached the Burrell car and attempted to

open the rear driver's-side door. A man inside, previously unseen, held the door shut. She went around the other side, got in the car, and drove off. The dark car followed closely behind. Pifer and Ford watched both cars stop at the stop sign and turn left, headed in the direction of Coventry Estates.

Christopher Morrison and Justain Nelson Celebrate a Birthday

June 23, 2012 was Christopher Morrison's birthday. He lived in Apartment C in a four-apartment building at Coventry Estates with his pregnant fiancée, Nijier Thomas. The two spent the day together at the apartment and gathered food and liquor for a planned birthday cookout later that evening in Zanesville. Morrison and Thomas headed to the party in Zanesville around 6:00 p.m. in Morrison's green Avalanche.

Present at the birthday party were Justain Nelson, Morrison's best friend, and Nelson's mother, Theresa Glover. The party lasted until around 11:00 p.m., then some of the guests went to the "U Bar," a location in Zanesville. Morrison, Thomas, and Nelson were in the Avalanche and stayed in the parking lot. Morrison and Thomas argued because he had been drinking and she didn't want him to drive. Thomas ended up staying behind at the "U Bar" with friends while Morrison and Nelson drove off in the Avalanche. Glover saw her son in the truck with Morrison.

Around 1:15 a.m., Morrison called Thomas to say he was home.

The Burrell Car and the Sharrer Car Drive by Coventry Estates

The Chevy Cruze was driven by Churchill; Burrell was in the front passenger seat; Blanchard was behind him in the back seat, and a fourth black male was in the rear driver's-side seat. Churchill and Blanchard did not identify this man; Blanchard said he had "old braids" which were partially grown out and spoke to someone on an "Obama phone." Churchill said the man did not speak but at one point Burrell had mentioned his name was "Zone."

The black car following the Burrell car was a rented Mazda driven by Patience Sharrer [the "Sharrer car"]. Also in the car were Deondre Crosby and Elgin Mitchell.

The two cars drove past Coventry Estates. Blanchard pointed out the apartment of Christopher Morrison. Morrison's Avalanche was parked in the rear of the building. Both cars turned around, pulled down a side street, and stopped. Blanchard and Burrell directed

Mitchell and Crosby to the apartment. The man with "old braids" got out of the Burrell car and into the Sharrer car.

Burrell, Churchill, and Blanchard drove off and proceeded to spend the next hour driving around Cambridge.

At trial, Elgin Mitchell identified appellant as the man from Columbus, the individual with "old braids" who got into Sharrer's car. Sharrer drove; Crosby was in the front passenger seat; Mitchell and appellant were in the back seat. The Sharrer car headed back toward Coventry Estates; Burrell called again to say which apartment it was.

Sharrer pulled over and stopped. Mitchell, Crosby, and appellant exited the car, climbed over a guardrail, and hid near a tree near the apartment revolver building. They could see into the apartment through the blinds; two men appeared to be asleep inside, on two separate couches.

The Home Invasion and Murders: Elgin Mitchell's Account

Mitchell said he had no weapon on him and didn't see a weapon on Crosby or appellant prior to the robbery. Appellant put on a ski mask he brought along.

Appellant rammed open the front door with his arms and was the first to enter the apartment, followed by Crosby and Mitchell. Mitchell saw appellant now had a black pistol he thought was a .9 millimeter semi-automatic. Crosby proceeded directly up the stairs inside the door to the bedrooms. Appellant went towards Justain Nelson, the man sleeping on the couch against the wall. Christopher Morrison was on a couch in front of the window. Mitchell stood back, guarding the door.

Crosby came back downstairs after a very short time, now holding a .22 revolver, asking Morrison "where the money at (sic )." Morrison responded he didn't know what Crosby was talking about. Appellant ran into the kitchen and started rifling through cereal boxes, then came back into the living room and again stood in front of Nelson. Nelson told Morrison "Just give it up" and Morrison said again "I don't know what you're talking about." Crosby then shot Morrison in the face.

Nelson stood up and tried to run, crashing through the sliding glass doors in the rear of the apartment, off the kitchen. Appellant shot Nelson in the back as he fled.

The Burrell Car Returns to the Area of Coventry Estates

During the home invasion and murders, the Burrell car drove around Cambridge. Burrell was getting calls on his cell phone and eventually told Churchill to head back in the general direction of Coventry Estates. Someone on the phone told Burrell he saw the car's headlights. The "same guy from before," the unidentified black male, got into the backseat of the Burrell car and they drove to Zanesville. Churchill said the man had changed clothes.

Churchill later testified there was no conversation in the car about what happened during the robbery. He claimed to know nothing until the next day when Burrell told him "when they did that they killed those people."

Churchill would later return to the spot where he picked up the man, with detectives, telling them the man said he thought he lost his gun there.

The Neighbors React after the Murders

Neighbors heard commotion shortly after 2:00 a.m. on Sunday, June 24, 2012 that sounded first like someone kicking a door in and then like someone running up and down the stairs of Apartment C. Then witnesses heard several gunshots, then silence. Neighbors looked out their windows and saw no one in the immediate aftermath of the shots, so several called 911 and left their apartments to investigate.

They found Christopher Morrison in the front of the apartment complex, on the ground, still breathing but covered in blood. Morrison died at the scene shortly thereafter as city police, sheriff's deputies, and emergency medical personnel arrived.

Troopers discovered Justain Nelson in the backyard of the apartment complex, lying motionless on the ground, moaning, with blood on his chest, shirt, and face. He was transported for medical treatment but died at the hospital.

Both Victims Die of Multiple Gunshot Wounds

The autopsy performed on Christopher Morrison revealed five gunshot wounds, including one near his left eye, neck, shoulder, chest, and thigh. Justain Nelson sustained four gunshot wounds: to the middle of his back, between his belt line and his shoulders; his left lower abdomen, his left thigh, and his left buttock. The bullets

recovered from the body of Morrison were a different size, shape, and caliber than the bullets recovered from the body of Nelson. Nelson also sustained sharp, incised wounds to his right palm, and scrapes and abrasions to his elbows, forearms, knee, and heel, consistent with running and falling through glass. Toxicology tests on both victims revealed no evidence of any illicit drug use; both men's blood tested positive for beverage alcohol.

Both victims died of multiple gunshot wounds. The coroner opined that in both cases, death was not necessarily instantaneous: both victims were capable of running a short distance, then passing out and bleeding to death from their wounds, consistent with the scene discovered by neighbors, law enforcement, and emergency medical personnel in which both men were found short distances from the apartment, linked by trails of blood.

The Investigation

In the immediate aftermath of the murders, witnesses came forward. Family members of the victims gathered at the crime scene and provided Detective Williams of the Guernsey County Sheriff's Department with the names of Maigen Blanchard and Tyler Burrell. During the day more people called in reporting Blanchard's involvement, and Blanchard herself called Williams around 3:30 p.m. Sunday, initially denying her role.

Law enforcement began a series of interviews with suspects they were able to identify, starting with Blanchard. Over a series of interviews, Blanchard was initially deceptive, prompting police to bring in her incarcerated boyfriend, Brock Dilley, to convince her to cooperate. Blanchard then provided the names of Boomer Churchill and Tyler Burrell, and stated there was a second black car driven by a skinny white female containing two black males she didn't know. She also stated a third unknown black male arrived at her stepmother's house in the Burrell car; she believed this person to be Burrell's associate from Columbus.

Williams interviewed Boomer Churchill, who provided the names of Deondre Crosby, Elgin Mitchell, and Patience Sharrer. He, too, mentioned an unknown black male in the group, a friend of Burrell's from Columbus, possibly known by the nickname "Zone."

Williams used the suspects' cell phone records to track down multiple calls the night of the murders with a 614 area code number.

The subscriber to this number is Christine Pollard, the mother of appellant James Whatley, Jr. and Jamar Whatley, appellant's brother who lives in Zanesville. The phone number relates to a government-issued "Obama phone." The cell phone records also put the user of the Pollard phone in the immediate vicinity of Coventry Estates on the night of the murders. The Ohio Bureau of Criminal Investigation (BCI) reported that DNA tests on a nylon cap found during evidence collection came back with a CODIS hit matching appellant. Williams also learned appellant's Facebook alias is "War Zone." Another number identified in the cell phone traffic from the night of the murders was traced to Nicole Groves, mother of two of appellant's children.

Boomer Churchill offered to take detectives to the area where he picked up the unknown Columbus accomplice after the murders. In the tall weeds and grass around this wooded area, detectives found clothing, a holster, and a black Smith and Wesson .9 millimeter semi-automatic pistol.

The BCI firearms expert testified State's Exhibit O, the bullet recovered from the body of Justain Nelson, could not be positively identified as having come from the Smith and Wesson .9 millimeter, but it could not be ruled out, either.

The Home Invasion and Murders: Appellant's Account

Appellant was the only defense witness at trial. He testified he was at his brother's house in Zanesville on Friday, June 22, 2012 when Tyler Burrell came over and mentioned "licks" that he knew of, asking appellant whether he wanted to be involved. That night, Burrell showed up with Churchill, they picked up appellant and two other unknown males, and drove around looking at potential robbery sites. Each site that night was ruled out for various reasons, but Burrell stated he still had the possibility of something else: he called a girl, put her on speakerphone, and she said "it's in there." Burrell then dropped off appellant at his brother's house.

The next evening, Saturday, June 23, Burrell returned and asked if appellant wanted to take a look at something else; there would be $60,000 in cash and no guns involved. Appellant ripped two t-shirt sleeves off a work shirt to cover his face with; he denied wearing a ski mask at any point. Burrell and Churchill arrived very early Sunday morning to pick him up; Churchill drove and Burrell was on the phone off and on. They were followed by another car. They pulled up at a house, a girl came out and tried to get in the

Churchill car; at first appellant resisted letting her into the car because he was angry that Burrell was involving more people.

Both cars proceeded toward Coventry Estates and Burrell and Blanchard pointed out the target apartment. At some point, appellant learned Burrell had no intention of entering the apartment himself and appellant was angry because Burrell wanted others to commit the robbery he set up.

Appellant did not know the men in the dark car. Throughout his testimony he referred to Mitchell as "the taller one" and Crosby as "the shorter one." The three lay on the ground by a tree outside the apartment and could see through the blinds that two people were inside. (Appellant stated he was told no one would be there.) He noticed Mitchell had a gun in his hand.

Appellant stated he opened the front door of the apartment easily by hitting it with his arms. Appellant remained outside the apartment at first; Mitchell entered, went to Nelson, woke him, and made him lay on the ground; Crosby ran upstairs and very quickly came back down with a gun in his hand. Morrison then sat up on the other couch and Crosby pushed him back down. Appellant entered the apartment because he didn't want to stay outside. Mitchell told appellant to close the blinds and he did so. Appellant stated he was in the process of closing the apartment door when he heard "pow, pow, pow" and he took off running away from the apartment.

Outside, he called Burrell to say "Those dudes started shooting." He asked the Burrell car to come back to pick him up because the Sharrer car was gone. The Burrell car came back for him. Appellant said he told Burrell, Blanchard, and Churchill what happened in the apartment and was very upset and angry. He told Churchill to drop him off in an alley in Zanesville because he didn't want anyone in the group to know where "his people" lived.

"The First One on the Bus gets the Best Seat "

At trial Det. Williams acknowledged the evidence tying appellant to the murders is circumstantial; the only testimony placing a gun in appellant's hand is Mitchell's. When asked, Williams agreed he has heard the axiom "The first one on the bus gets the best seat."

Appellant's accomplices entered negotiated guilty pleas and in exchange for their truthful testimony appellee will not object to judicial release earlier than the stated terms: Megan [sic]

Blanchard received a 10–year prison term; Boomer Churchill a 6–year prison term; Tyler Burrell a 15–year prison term; and Elgin Mitchell an 11–year prison term. Patience Sharrer was not criminally charged and failed to appear at trial upon subpoena. Deondre Crosby apparently has not yet been tried; the record is silent as to the outcome of his indictment.

Conviction and Sentence: Life Without Parole

Appellant was found guilty of one count of complicity to aggravated murder with a firearm specification (Count I) for the death of Christopher Morrison. He was found guilty of one count of aggravated murder with a firearm specification (Count II) for the death of Justain Nelson. He was also found guilty of aggravated robbery (Count III) and aggravated burglary (Count IV), both with firearm specifications. The parties agreed Counts III and IV merged into Counts I and II for sentencing purposes, and appellant could only be sentenced upon one firearm specification.

On Count I, complicity to aggravated murder, appellant was sentenced to a prison term of 25 years to life. On Count II, aggravated murder, appellant was sentenced to life in prison without the possibility of parole. Upon the single firearm specification, he received a consecutive term of 3 years.

Appellant now timely appeals from the judgment entry of his conviction and sentence.

Appellant raises two assignments of error:

ASSIGNMENTS OF ERROR

"I. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THE STATE OF OHIO TO PROVIDE A TRANSCRIPT OF FORMER TESTIMONY GIVEN BY A CODEFENDANT AT THE TIME OF HER NEGOTIATED PLEA AND AT THE TIME OF HER TESTIMONY BEFORE THE GRAND JURY."

"II. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT REMOVING A JUROR DUE TO HER SIGNIFICANT COUGHING AND ORDERING THAT AN ALTERNATE JUROR SERVE IN HER PLACE BECAUSE THE JUROR'S SIGNIFICANT COUGHING PREVENTED THE DEFENDANT FROM HAVING A FAIR TRIAL."

*State v. Whatley,* No. 13CA26, 2014 WL 1340050, at *1-6 (Ohio App. 5th Dist. March 10, 2014). On March 10, 2014, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner did not file a timely appeal. On May 19, 2014, he filed a motion for a delayed appeal. (ECF No. 8-1, PageID# 195.) On July 9, 2014, the Ohio Supreme Court denied the motion for a delayed appeal. *State v. Whatley*, 139 Ohio St.3d 1470 (Ohio 2014).

On November 10, 2014, Petitioner filed a delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 8-1, PageID# 211.) The appellate court granted Petitioner leave to file the delayed Rule 26(B) application. (PageID# 293.) However, on June 22, 2015, the appellate court denied the Rule 26(B) application. (PageID# 386.) On October 28, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S. Ct. Prac. R. 7.08(B)(4). *State v. Whatley*, 143 Ohio St.3d 1501 (2015).

On July 29, 2016, Petitioner filed this *Petition*. (ECF No. 6.) The sole claims remaining for this Court's review include claim one, in which Petitioner asserts that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder of Justain Nelson; and claim two, in which Petitioner asserts that the trial court failed to properly instruct the jury on the required *mens rea* to establish aggravated murder (claim two). Petitioner has withdrawn claim three. *Traverse* (ECF No. 23, PageID# 2084.) As discussed, this Court has previously dismissed the remainder of Petitioner's claims. *Opinion and Order* (ECF No. 19.) It is the position of the Respondent that Petitioner has failed to establish cause and prejudice for his procedural default of these claims one and two.

## Procedural Default

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of

habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*)(citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas . . . ." *Coleman* v. *Thompson*, 501 U.S. 722, 735 n. 1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)), *cert. denied*, 544 U.S. 928 (2005). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not

resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case-that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, the Court must decide whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.), *cert. denied*, 474 U.S. 831 (1985).

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at

452 (quoting *Murray*, 477 U.S. at 479).  That is because, before counsel's ineffectiveness will

constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment,

and therefore must be both exhausted and not procedurally defaulted."  *Burroughs v. Makowski*,

411 F.3d 665, 668 (6th Cir.), *cert. denied*, 546 U.S. 1017 (2005).  Or, if procedurally defaulted,

petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the

ineffective-assistance claim itself."  *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). The

Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in Coleman: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by " 'letting the time run' " so that state remedies were no longer available. *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].' " *Id.*, at 854, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray*, 477 U.S. at 495–96), *cert. denied*, __ U.S. __, 135 S. Ct. 1545 (2015).

Petitioner failed to raise his allegations in claims one and two on direct appeal. Further, he may now no longer do so under Ohio law, which provides that an issue appearing on the record but not raised on direct appeal is barred by the doctrine of *res judicata. See State v. Cole*, 2 Ohio St. 3d 112 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16 (1981); *State v. Perry*, 10 Ohio St. 2d 175 (1967). The United States Court of Appeals for the Sixth Circuit has held that Ohio's doctrine of *res judicata* constitutes an adequate and independent state ground to preclude federal habeas corpus review. *See Williams v. Bagley*, 380 F.3d 932, 966-67 (6th Cir. 2004)(citing *Greer*, 264 F.3d at 673; *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir.), *cert. denied*, 528 U.S. 946 (1999)), *cert. denied*, 544 U.S. 1003 (2005). Additionally, this Court has consistently determined that Ohio's *res judicata* rules serve important state interests in the finality of criminal convictions. *See, e.g. Davis v. Morgan*, No. 2:15-cv-00613, 2016 WL 6493420, at *11 (S.D. Ohio Nov. 2, 2016), *adopted and affirmed*, 2017 WL 56034 (S.D. Ohio Jan. 5, 2017). Petitioner has thereby procedurally defaulted claims one and two for federal habeas corpus review.

Petitioner may still secure review of the merits of these claims if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the

constitutional violations that he alleges. "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001)(citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)(internal citation omitted)). A petitioner's *pro se* status, ignorance of the law, and ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir.), *cert. denied*, 543 U.S. 989 (2004). Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), *cert. denied sub nom., Hartman v. Bobby*, 554 U.S. 924 (2008).

As cause for his procedural default, Petitioner asserts the denial of the effective assistance of appellate counsel. This Court will consider the merits of that claim, in order to determine whether Petitioner can establish cause and prejudice for his procedural default.

### Standard of Review

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, __ U.S. __, 134 S. Ct. 10, 16 (2013)(quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010)("AEDPA ... imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and

forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated

on the merits in State court proceedings" unless the state court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be

correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1)

Accordingly, "a writ of habeas corpus should be denied unless the state court decision

was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, or based on an unreasonable determination of the facts in light

of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir.)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006), *cert. denied*, 551 U.S. 1134 (2007)),

*cert. denied*, __ U.S. __, 134 S. Ct. 315 (2013). The United States Court of Appeals for the Sixth

Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the

state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id.* at 748–49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

### Ineffective Assistance of Appellate Counsel

"In all criminal prosecutions," the Sixth Amendment affords "the accused ... the right ... to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied*, __ U.S. __, 134 S. Ct. 680 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. 2013)(quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted), and citing *Strickland*, 466 U.S. at 687), *cert. denied*, __ U.S. __, 135 S. Ct. 122 (2014). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions

in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the

warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576

F.3d 284, 287 (6th Cir. 2009)(quoting *Strickland*, 466 U.S. at 689).

> The *Strickland* test applies to appellate counsel. *Smith v. Robbins*,
> 528 U.S. 259, 285, 120 S.Ct. 746 (2000); *Burger v. Kemp*, 483
> U.S. 776 (1987) . . . . Counsel's failure to raise an issue on appeal
> amounts to ineffective assistance only if a reasonable probability
> exists that inclusion of the issue would have changed the result of
> the appeal. Id...... The attorney need not advance every argument,
> regardless of merit, urged by the appellant. Jones v. Barnes, 463
> U.S. 745, 751–752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)
> ("Experienced advocates since time beyond memory have
> emphasized the importance of winnowing out weaker arguments
> on appeal and focusing on one central issue if possible, or at most
> on a few key issues." 463 U.S. 751–52).

*Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2013 WL 831727, at *28 (S.D.

Ohio March 6, 2013). Factors to be considered in determining whether a defendant has been

denied the effective assistance of appellate counsel include:

> (1) Were the omitted issues "significant and obvious"?

> (2) Was there arguably contrary authority on the omitted issues?

> (3) Were the omitted issues clearly stronger than those presented?

> (4) Were the omitted issues objected to at trial?

> (5) Were the trial court's rulings subject to deference on appeal?

> (6) Did appellate counsel testify in a collateral proceeding as to his
> appeal strategy and, if so, were the justifications reasonable?

> (7) What was appellate counsel's level of experience and expertise?

> (8) Did the petitioner and appellate counsel meet and go over
> possible issues?

> (9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes,* 171 F.3d at 427–28 (citations omitted).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington,* 562 U.S. at 105. The Court observed that, while "'[s]urmounting Strickland's high bar is never . . . easy,' . . . , [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is even more difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and citing *Strickland*, 466 U.S. at 689). The Supreme Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly so.'" *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

The state appellate court, applying the standard set forth in *Strickland*, concluded that Petitioner had failed to establish the denial of the effective assistance of appellate counsel in relevant part as follows:

> Appellant argues his conviction upon one count of aggravated murder of Justain Nelson (Count II) is not supported by sufficient evidence and is against the manifest weight of the evidence.FN1 We disagree.
>
> FN1: Appellant does not challenge his convictions upon Count I (complicity to aggravated murder of Christopher Morrison); Count III (aggravated robbery) and Count IV (aggravated burglary).

Appellant testified at trial and admitted his role in the robbery at Morrison's apartment during which a co-defendant shot Morrison. Appellant denies shooting Justain Nelson as Nelson fled from the apartment.

The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380. . . . The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

*       *       *

Appellant was convicted upon one count of aggravated murder pursuant to R.C. 2903.01(B), which states: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery, [or] * * * aggravated burglary * * *." Appellant argues his conviction for the death of Justain Nelson is based solely upon the testimony of co-defendant Elgin Mitchell and is therefore against the manifest weight and sufficiency of the evidence.

As we addressed above in footnote one, appellant's presence at the scene is not disputed and was admitted by appellant at trial. The thrust of appellant's argument here is that only the testimony of Elgin Mitchell put the gun in appellant's hand regarding the aggravated murder of Justain Nelson.

In this case Mitchell testified appellant had a black .9 millimeter semi-automatic pistol in his hand as the accomplices forced their way into the apartment. He further testified that after another co-defendant, Crosby, shot the other victim, Nelson fled from the apartment and appellant shot him in the back. Another co-defendant, Churchill, testified he picked up a man after the murders and later led police to a black Smith and Wesson .9 millimeter semi-automatic pistol the man said he lost. The

description of this man resembled appellant. An expert witness testified the bullet recovered from Nelson's body could not be positively identified as having come from the Smith and Wesson .9 millimeter, but it could not be ruled out, either.

*        *        *

Based on the testimony adduced at trial and the great deference this Court must accord to the trier of fact, we conclude that appellant's convictions were not against the manifest weight or sufficiency of the evidence. The testimony described above, if believed, is sufficient to convince the average mind of appellant's guilt beyond a reasonable doubt. In reviewing the entire record in the case as a whole, we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred.

Appellant has not demonstrated [that] if appellate counsel had raised the [issue], the outcome of his appeal would have been different.

. . . [A]ppellant argues the trial court improperly instructed the jury. We disagree.

Appellant points to the following instruction in support of his argument that the trial court effectively removed the element of "purposely causing death" from the instructions:

*        *        *

Defendant must be shown to have acted purposefully. Purpose is an essential element of the crime of aggravated murder. A person acts purposefully when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to commit or attempt to commit aggravated robbery and/or aggravated burglary in the commission of aggravated murder.

Now, how do you determine whether or not a person acts with purpose. The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the

means or the weapon used, and all of the other facts and circumstances in evidence.

*    *    *

Jury instructions must be viewed as a whole and will not be reversed if, in their entirety, they "make clear that the jury must find purpose to kill in order to convict." *State v. Phillips*, 74 Ohio St.3d 72, 100, 656 N.E.2d 643 (1995), citing *State v. Burchfield*, 66 Ohio St.3d 261, 611 N.E.2d 819 (1993). We find the instruction permits the jury to find the purpose to kill may be determined from the use of a firearm in a home-invasion robbery.

The challenged instruction is similar to one approved by the Ohio Supreme Court in *State v. Phillips*, 74 Ohio St.3d 72, 100, 1995-Ohio-171, 656 N.E.2d 643. (Instruction that purpose "is determined from the manner in which [an act] is done, the means used and all the other facts and circumstances" "simply sets forth general categories of evidence from which the jury could determine the purpose of an act.")

Appellant's [] proposed assignment of error is without merit and appellate counsel was not ineffective for failing to make this argument.

*Judgment Entry* (ECF No. 8-1, PageID# 390-96.)

In addressing a sufficiency of the evidence claim, a reviewing court must view all of the evidence in the light most favorable to the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When so doing, and for the reasons addressed by the state appellate court, the evidence is constitutionally sufficient to sustain Petitioner's conviction on the aggravated murder of Justain Nelson. Petitioner has failed to establish the denial of the effective assistance of appellate counsel on this basis.

Petitioner argues that the trial court improperly instructed the jury that, so long as they found he had the intent to commit aggravated robbery or burglary in the commission of aggravated murder, that he should be found guilty of aggravated murder, without requiring the jury to find that he had the purpose, or intent, to cause death. *Traverse* (ECF No. 23, PageID#

2083.) He maintains that the jury instructions were ambiguous and relieved the prosecutor of its burden of proving intent. (PageID# 2083-84.) The Court does not agree. The record indicates that the trial court instructed the jury that Petitioner had been charged with "purposefully" causing the death of Christopher S. Morrison and Justain Nelson, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery and/or aggravated burglary. *Trial Transcript, Vol. V* (ECF No. 11-2, PageID# 1883-84, 1887.)

> Now, in defining the crime of aggravated murder, I have used the term the Defendant must be shown to have acted purposefully. Purpose is an essential element of the crime of aggravated murder. A person acts purposefully when it is his specific intention to cause a certain result.

(PageID# 1887.) The trial court defined purpose, as required under Ohio law, as discussed by the state appellate court. (*See* PageID# 1887-88.) The trial court again defined "purpose," and the requirement that the jury must find that the Petitioner acted purposely in order to return a guilty verdict, when it instructed the jury on the law regarding charges on complicity to commit aggravated murder of Christopher Morrison and Justain Nelson. (PageID# 1889-90.) Moreover, the state appellate court has determined that these instructions complied with Ohio law. This Court defers to that determination. *See Beavers v. Franklin County Adult Probation*, No. 2:13-cv-00404, 2016 WL 5660275, at *1 (S.D. Ohio Sept. 29, 2016) (citation omitted). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). Therefore, Petitioner has failed to establish the denial of the effective assistance of counsel due to his attorney's failure to raise such issue on appeal.

For the reasons discussed by the state appellate court, Petitioner has failed to establish the denial of the effective assistance of counsel under the two-prong *Strickland* test. He therefore likewise has failed to establish cause for his procedural default.

## Actual Innocence

The United States Supreme Court has also held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [a petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray,* 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to authorize a federal court in reaching the merits of an otherwise procedurally-barred habeas petition. *Schlup,* 513 U.S. at 317. However, the actual innocence claim is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The actual innocence exception to procedural default allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones,* 395 F.3d 577, 602 (6th Cir. 2005). The Court of Appeals for the Sixth Circuit explained this exception as follows:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at

316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter,* 395 F.3d at 589–90 (footnote omitted). Petitioner does not meet these standards here.

After an independent review of the record, the Court does not deem this to be so extraordinary a case as to relieve petitioner of his procedural default.

## Recommended Disposition

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in

part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE